# EXHIBIT 1

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 OR 15(d) of The Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): November 3, 2021

# MULLEN AUTOMOTIVE INC.

_____
(Exact name of registrant as specified in its charter)

| Delaware | 001-34887 | 86-3289406 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

1405 Pioneer Street, Brea, California 92821
(Address, including zip code, of principal executive offices)

Registrant's telephone number, including area code (714) 613-1900

Net Element, Inc., 3363 NE 163rd Street, Suite 606, North Miami Beach, Florida 33160
(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 | MULN | The Nasdaq Stock Market, LLC (Nasdaq Capital Market) |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**INTRODUCTORY NOTE**

As previously disclosed in Current Reports on Form 8-K filed with the Securities and Exchange Commission (the "**SEC**") by Mullen Automotive Inc. (f/k/a Net Element, Inc.), a Delaware corporation (the "**Company**"), on July 21, 2021 and August 19, 2021 (collectively, the "**Merger Current Report**"), the Company entered into a Second Amended and Restated Agreement and Plan of Merger, as amended by a First Amendment entered into on August 18, 2021 (together, the "**Merger Agreement**"), with Mullen Technologies, Inc., a California corporation ("**Mullen Technologies**"), Mullen Acquisition, Inc., a California corporation and wholly owned subsidiary of the Company ("**Merger Sub**"), and Mullen Automotive, Inc., a California corporation ("**Mullen Automotive-California**") and a wholly-owned subsidiary of Mullen Technologies, providing for the merger of Merger Sub with and into the Mullen Automotive (the "**Merger**"), with Mullen Automotive-California surviving the Merger as a wholly-owned subsidiary of the Company.

The Company called a special meeting of stockholders (the "**Special Meeting**") to approve the Merger Agreement, which Special Meeting was held on August 26, 2021 (that was adjourned on August 26 and resumed and concluded on August 31, 2021). As reported in the Current Report on Form 8-K filed with the SEC on August 31, 2021 (the "**August Current Report**"), the holders of the requisite number of shares of the Company's Common Stock, par value $0.001 per share (the "**Common Stock**") approved the Merger, adopted the Merger Agreement, approved certain amendments to the Company's Amended and Restated Certificate of Incorporation and other actions related to the Merger. The Merger closed on November 5, 2021 (the "**Closing Date**").

The foregoing summary of the Merger Agreement and the transactions contemplated thereby does not purport to be complete and is subject to, and qualified in its entirety by, the full text of the Merger Agreement attached as Exhibit 2.1 to the July Current Report, which is incorporated herein by reference.

**Item 2.01      Completion of Acquisition or Disposition of Assets.**

The information contained in the Introductory Note of this Current Report on Form 8-K is incorporated by reference into this Item 2.01.

**The Merger and Issuance of Shares**

As described in the Introductory Note above, on November 5, 2021, pursuant to the terms of the Merger Agreement, the Company closed the Merger whereby Merger Sub merged with and into the Mullen Automotive-California, with Mullen Automotive-California surviving as a wholly-owned subsidiary of the Company and changed its name to "Ottava Automotive Inc." At the effective time of the Merger, each share of Mullen Automotive-California common stock, Series A Preferred Stock, Series B Preferred Stock and Series C Preferred Stock issued and outstanding immediately prior to the Merger Effective Time, other than dissenting shares, were canceled and converted automatically into the right to receive a number of shares of Company Common Stock, Series A Preferred Stock, Series B Preferred Stock and Series C Preferred Stock, as the case may be, determined in accordance with the Merger Agreement and as provided in Schedule A to the Merger Agreement. As a result, the Company issued an aggregate of 15,647,321 shares of Common Stock, 1,536,692 shares of Series A Preferred Stock, 5,567,319 shares of Series B Preferred Stock, and 4,973,093 shares of Series C Preferred Stock. Pursuant to the closing of the merger, there are 51,731,640 million shares issued and outstanding on a fully diluted basis, all of Mullen Automotive's outstanding common and preferred shares were exchanged for Net Element common and preferred stock; an aggregate of 43,971,895 million shares which represents 85 percent of the combined company, were allocated to holders of common stock, preferred stock and reserved for issuance under outstanding warrants.

The issuance of 8,000,000 shares of Common Stock, 200,000 shares of Series A Preferred Stock, 12,000,000 shares of Series B Preferred Stock, and 40,000,000 shares of Series C Preferred Stock in connection with the Merger was registered under the Securities Act of 1933, as amended, pursuant to the Company's registration statement on Form S-4 (File No. 333-256166), as amended, declared effective by the SEC on July 26, 2021 (the "**Registration Statement**").

Prior to the Merger, the Company (as Net Element, Inc.) transferred its assets and liabilities to RBL Capital Group LLC ("**RBL**") in full satisfaction of the outstanding loan balance owed to RBL by Net Element and its subsidiary or affiliated entities pursuant to a Divestiture Agreement, dated July 20, 2021, which was filed with the Registration Statement as exhibit 10.2.

The proxy statement/prospectus included in the Registration Statement contains additional information about the Merger and related transactions.

**Item 3.02**      **Unregistered Sales of Equity Securities**

| Name | Restricted Shares of Common Stock |
|---|---|
| David Michery | 5,154,049 |
| Elegant Funding Inc. | 171,652 |
| Keith R. Drohan | 623 |
| Tiffany A Drohan | 1,946 |
| Tiffany N Drohan | 1,646,456 |
| HLE Development Inc. | 672,595 |
| Total | 7,647,321 |

Issuance of Exchange Agreement Warrants to purchase 13,481,188 shares of common stock a purchase price of $8.83 per share.

**Item 5.02**      **Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers**

On the Closing Date and as contemplated by the terms of the Merger Agreement, Oleg Firer, John Roland, Jon Najarian, and Todd Raarup each resigned as a director of the Company (including any committee of the board of directors of the Company) and Jeffrey Ginsberg, Andrey Krotov, Vlad Sadovskiy, and Steven Wolberg resigned as officers of the Company. At such time, as approved at the Special Meeting and reported in the August Current Report, the following became directors of the Company to serve until the annual meeting of the year noted next to their respective Class name and until their respective successors are duly elected and qualified, subject to such directors' earlier death, resignation, retirement, disqualification or removal:

| Name of Director | Class |
|---|---|
| David Michery | Class I – 2022 |
| Jerry Alban | Class I - 2022 |
| Mary Winter | Class I – 2022 |
| Kent Puckett | Class II – 2023 |
| Mark Betor | Class II – 2023 |
| William Miltner | Class III – 2024 |
| Jonathan New | Class III - 2024 |

Also on the Closing Date and as contemplated by the terms of the Merger Agreement, the following individuals were appointed as officers of the Company:

| Name | Position |
|---|---|
| David Michery | Chief Executive Officer |
| Kerri Sadler | Chief Financial Officer |
| Jerry Alban | Chief Operating Officer |
| Mary Winter | Secretary |

Biographical information about each officer and director, including appointments to the Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee is included in, and incorporated herein by reference to, the Registration Statement under the section entitled "*Management Following the Merger*."

On the Closing Date, each of Oleg Firer, Steven Wolberg, and Jeffrey Ginsberg were granted restricted stock awards for common stock of the Company, in amounts of 150,172 shares, 73,504, and 12,665 shares, respectively, all of which vested in full on the Closing Date.

**Item 5.03**      **Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year**

On November 3, 2021, the Company filed an amendment to its Amended and Restated Certificate of Incorporation (the "**Certificate Amendment**") with the Delaware Secretary of State, pursuant to which the Company's name was changed from "Net Element, Inc." to "Mullen Automotive Inc." A copy of the Certificate Amendment is included as Exhibit 3.1 hereto.

Effective at 12:01 p.m. Pacific Time on November 5, 2021, the Company filed a Second Amended and Restated Certificate of Incorporation (the "**Second Amended and Restated Certificate of Incorporation**") with the Delaware Secretary of State of the State to effectuate the following changes, which were approved at the Special Meeting and reported in the August Current Report:

· change the par value and to increase the number of authorized shares of common stock from 100,000,000 shares, par value $0.0001, to 500,000,000 shares, par value $0.001;

· (a) to change the par value and increase the number of authorized shares of preferred stock from 1,000,000, par value $0.01, to 58,000,000 shares, par value $0.001 (the "**Preferred Stock**"); (b) to authorize the issuance of up to 200,000 shares of Series A Preferred Stock, which series carries 1,000 votes per share and converts into Common Stock on a 100-for-1 basis (the "**Series A Preferred Stock**"); (c) to authorize the issuance of up to 12,000,000 shares of Series B Preferred Stock, which series carries one vote per share and converts into Common Stock on a 1-for-1 basis (the "**Series B Preferred Stock**"); and (d) to authorize the issuance of up to 40,000,000 shares of Series C Preferred Stock, which series carries one vote per share and converts into Common Stock on a 1-for-1 basis (the "**Series C Preferred Stock**");

· classify the Board of Directors; and

· other changes, including removal of the restriction on the right for stockholders to act by written consent.

·
A copy of the Second Amended and Restated Certificate of Incorporation is included as Exhibit 3.2 hereto.

In connection with the Merger of Net Element and Mullen Automotive-California, Net Element became the parent company of Mullen Automotive-California. The Merger has been accounted for as a reverse merger transaction, in which Mullen Automotive-California is treated as the acquirer for financial accounting purposes. On November 5, 2021, the Board of Directors approved a change in the Company's fiscal year end from December 31 to September 30, the fiscal year end of Mullen Automotive-California. In accordance with SEC guidance, a transition report is not required in connection with this change in the Company's fiscal year end. Accordingly, the Company intends to file its Annual Report on Form 10-K for the fiscal year ended September 30, 2021.

**Item 7.01**       **Regulation FD**

On November 5, 2021, the Company issued a press release announcing trading under Nasdaq stock ticker symbol "MULN." A Copy of the press release is attached hereto as Exhibit 99.2 and the information therein is incorporated herein by reference.

*The information contained in this Item 7.01 and in the accompanying Exhibit 99.2 shall not be deemed filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") , or incorporated by reference in any filing under the Exchange Act or the Securities Act of 1933, as amended, except as shall be expressly set forth by specific reference in such filing.*

**Item 8.01.**       **Other Events.**

In connection with the Name Change, The Nasdaq Stock Market, LLC (Nasdaq Capital Market) ticker symbol for the Company's Common Stock changed from "NETE" to "MULN" at the opening of trading on November 5, 2021 (the "**Ticker Change**"). The new CUSIP number of the Common Stock is 62526P 109.

The Name Change and Symbol Change do not affect the rights of the Company's stockholders. The common stock will continue to be traded on The Nasdaq Stock Market, LLC (Nasdaq Capital Market). Following the Name Change, the stock certificates of the common stock, which reflect the former name of the Company, will continue to be valid. Certificates reflecting the Name Change will be issued in due course as old stock certificates are tendered for exchange or transfer to the Company's transfer agent.

Attached as exhibits and as referenced in Item 9.01 are financial statements required to be filed further to those transactions set forth herein.

**Item 9.01. Financial Statements and Exhibits**

   (d) Exhibits.

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Certificate Amendment |
| 3.2 | Second Amended and Restated Certificate of Incorporation |
| 99.1(a) | Audited financial statements for the year ended September 30, 2020 and 2019 |
| 99.1(b) | Interim unaudited financial statements for the nine months ended June 30, 2021 and 2020 |
| 99.1(c) | Pro forma financial statements for June 30, 2021 and September 30, 2020 |
| 99.2 | Press Release dated November 5, 2021 |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL) |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned hereunto duly authorized.

MULLEN AUTOMOTIVE INC.

Date: November 12, 2021                    By:  /s/ David Michery

                                                David Michery
                                                Chief Executive Officer

### CERTIFICATE OF AMENDMENT
### TO THE
### CERTIFICATE OF INCORPORATION
### OF
### NET ELEMENT, INC.

Net Element, Inc. (the "Corporation"), a corporation organized and existing under the General Corporation Law of the State of Delaware ("DGCL"), hereby certifies as follows:

**FIRST:** The Corporation was originally formed on April 20, 2010 in the jurisdiction of Cayman Islands as Cazador Acquisition Corporation Ltd., which filed its certificate of corporate domestication with the Secretary of State of the State of Delaware on October 2, 2012, and concurrently therewith filed an amended and restated certificate of incorporation with the Secretary of State of the State of Delaware changing the name of the corporation to Net Element International, Inc. (the "Original Certificate").

**SECOND:** The Corporation amended the Original Certificate by filing a certificate of amendment on December 5, 2013, changing the name of the Corporation to "Net Element, Inc." (the "Original Amended Certificate").

**THIRD:** The Corporation further amended the Original Amended Certificate by filing amendments thereto with the Secretary of State of the State of Delaware on December 16, 2014, April 30, 2015, June 15, 2015, May 24, 2016, June 16, 2016, and October 4, 2017 (as amended and together with the Original Amended Certificate, the "Certificate of Incorporation").

**FOURTH:** This Certificate of Amendment amends certain provisions of the Corporation's Certificate of Incorporation.

**FIFTH:** ARTICLE ONE of the Certificate of Incorporation is amended and restated in its entirety to read as follows:

"The name of the Corporation is Mullen Automotive Inc."

**SIXTH:** Pursuant to a written consent of the Board of Directors of the Corporation setting forth this proposed amendment to the Certificate of Incorporation, declaring said amendment to be advisable and in the best interest of the Corporation, the Board of Directors of the Corporation voted in favor of the amendment.

**SEVENTH:** This Certificate of Amendment was duly adopted in accordance with the Section 141(f) (by written consent of the Board of Directors of the Corporation) of the DGCL.

**EIGHTH:** All other provisions of the Certificate of Incorporation shall remain in full force and effect.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the Corporation has caused this Certificate of Amendment to be signed this 3rd day of November, 2021.

By: /s/ Oleg Firer

Name: Oleg Firer
Title: Chief Executive Officer

2

## SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
## OF MULLEN AUTOMOTIVE INC.

### a Delaware corporation

MULLEN AUTOMOTIVE INC., a corporation organized and existing under the General Corporation Law of the State of Delaware, hereby certifies as follows:

FIRST:  The corporation was originally formed on April 20, 2010 in the jurisdiction of Cayman Islands as Cazador Acquisition Corporation Ltd. ("Cazador"), which filed its certificate of corporate domestication with the Secretary of State of the State of Delaware on October 2, 2012, and concurrently therewith filed a certificate of merger with Cazador, including a restated certificate of incorporation changing the name of the corporation to Net Element International, Inc. (the "Corporation") (the "Original Certificate").

SECOND:  The Corporation amended the Original Certificate by filing a certificate of amendment on December 5, 2012, changing the name of the Corporation to "Net Element, Inc." (the "Original Amended Certificate").

THIRD:  The Corporation further amended the Original Amended Certificate by filing amendments thereto with the Secretary of State of the State of Delaware on December 16, 2014, April 30, 2015, June 15, 2015, May 24, 2016, June 16, 2016, and October 4, 2017 (as amended and together with the Original Amended Certificate, the "Further Amended Certificate").

FOURTH:  The Corporation amended the Further Amended Certificate by filing a certificate of amendment on November 3, 2021, changing the name of the Corporation to "Mullen Automotive Inc." (as amended and together with the Further Amended Certificate, the "Certificate of Incorporation").

FIFTH:  The Certificate of Incorporation of the Corporation is hereby amended and restated in its entirety as set forth in the Second Amended and Restated Certificate of Incorporation hereinafter provided for.

SIXTH:  Pursuant to resolution of the Board of Directors of the Corporation setting forth this proposed amendment of the Certificate of Incorporation, declaring said amendment to be advisable and calling a meeting of the shareholders of said corporation for consideration and approval, among other agenda items, of this proposed amendment, a special meeting of the shareholders of said corporation was duly called and held upon notice in accordance with Section 222 of the General Corporation Law of the State of Delaware (the "D.G.C.L"), at which meeting the necessary number of shares as required by statute were voted in favor of the amendment.

SEVENTH:   This amendment was duly adopted in accordance with the provisions of Sections 242 and 245 of the D.G.C.L. This Second Amended and Restated Certificate of Incorporation shall become effective as of its filing with the Secretary of State of the State of Delaware (the "Effective Time").

EIGHTH:   This Second Amended and Restated Certificate of Incorporation of the Corporation shall, at the Effective Time, read as follows:

## ARTICLE I

The name of the Corporation is Mullen Automotive Inc.

## ARTICLE II

The address of the registered office of the Corporation in the State of Delaware is 3500 South DuPont Highway, in the City of Dover, County of Kent, Zip Code 19901. The name of the Registered Agent at such address upon whom process against this Corporation may be served is Incorporating Services, Ltd.

## ARTICLE III

A.   Classes of Stock. This corporation is authorized to issue two classes of stock to be designated, respectively, common stock and preferred stock. The total number of shares that this corporation is authorized to issue is 558,000,000. The total number of shares of common stock authorized to be issued is Five Hundred Million (500,000,000), par value $0.001 per share (the "Common Stock"). The total number of shares of preferred stock authorized to be issued is Fifty Eight Million (58,000,000), par value $0.001 per share (the "Preferred Stock"), of which Two Hundred Thousand (200,000) shares are designated as "Series A Preferred Stock," Twelve Million (12,000,000) shares are designated as "Series B Preferred Stock," and Forty Million (40,000,000) shares are designated as "Series C Preferred Stock."

B.   Rights, Preferences and Restrictions of Preferred Stock. The Board of Directors is authorized, subject to any limitations prescribed by law, to provide for the issuance of the shares of Preferred Stock in series and, by filing a certificate pursuant to the applicable law of the State of Delaware, to establish from time to time the number of shares to be included in each such series, and to fix the designation, powers, preferences and rights of the shares of each such series and any qualifications, limitations or restrictions thereon. The number of authorized shares of Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the outstanding shares of Common Stock without a vote of the holders of the Preferred Stock, or of any series thereof, unless a vote of any such holders is required pursuant to the certificate or certificates establishing the series of Preferred Stock. The rights, preferences, privileges and restrictions granted to and imposed on the Series A Preferred Stock, Series B Preferred Stock and Series C Preferred Stock are as set forth below in this Article Ill(B).

2

1.      Dividends.

(a)      From and after the date of issuance of any share of the Series C Preferred Stock, a cumulative dividend shall accrue, whether or not declared by the board of directors of this corporation and whether or not there are funds legally available for the payment of dividends, on a daily basis in arrears at the rate of 15.0% per annum on the sum of the Series C Original Issue Price (as defined below) plus all unpaid accrued and accumulated dividends thereon. All accrued dividends on any share of the Series C Preferred Stock shall be paid in cash only when, as and if declared by the Board out of funds legally available therefor or upon a liquidation or redemption of the Series C Preferred Stock in accordance with the provisions of Article III(B)2(b) or Article III(B)3 (a); provided, that to the extent not paid on the fifth (5th) calendar day after the last day of each month (each such date, a "Series C Dividend Payment Date"), all accrued dividends on any share of the Series C Preferred Stock shall accumulate and compound on the applicable Series C Dividend Payment Date whether or not declared by the board of directors of this corporation and shall remain accumulated, compounding dividends until paid pursuant hereto or converted pursuant to Article III(B)4. All accrued and accumulated dividends on the shares of the Series C Preferred Stock as accrued pursuant to this Article III(B)1(a) shall be prior and in preference to any dividend on any other series of Preferred Stock or the Common Stock and shall be fully declared and paid before any dividends are declared and paid, or any other distributions or redemptions are made, on any other series of Preferred Stock or the Common Stock, other than to declare or pay any dividend or distribution payable on the Common Stock in shares of Common Stock. This corporation may elect to pay dividends for any month with a paid-in-kind election ("PIK") if (i) the issuance of the shares of Common Stock issuable further to the PIK has been registered pursuant to the Securities Act of 1933 and such registration remains effective, (ii) this corporation is then in compliance with all listing requirements of the Nasdaq Capital Market and (iii) the average daily trading dollar volume of this corporation's common stock for ten trading days in any period of twenty consecutive trading days on the Nasdaq Capital Market is equal to or greater than $2 million.

(b)      Any dividends or distributions, other than dividends or distributions accruing or paid on shares of the Series C Preferred Stock pursuant to Article III(B)1(a), shall be distributed among all holders of Common Stock and Preferred Stock in proportion to the number of shares of Common Stock that would be held by each such holder if all shares of Preferred Stock were converted to Common Stock at the then effective conversion rate without regard to any limitations on the conversion of the Preferred Stock contained in these Amended and Restated Certificate of Incorporation.

3

2.    <u>Liquidation Preference</u>.

    (a)    In the event of any Liquidation Event (as defined below), either voluntary or involuntary, the holders of Series B Preferred Stock shall be entitled to receive, prior and in preference to any distribution of the proceeds of such Liquidation Event (the "Proceeds") to the holders of the other series of Preferred Stock or the Common Stock by reason of their ownership thereof, an amount per share equal to the Series B Original Price (as defined below), plus declared but unpaid dividends on such share. If, upon the occurrence of such event, the Proceeds thus distributed among the holders of the Series B Preferred Stock shall be insufficient to permit the payment to such holders of the full aforesaid preferential amounts, then the entire Proceeds legally available for distribution shall be distributed ratably among the holders of the Series B Preferred Stock in proportion to the full preferential amount that each such holder is otherwise entitled to receive under this subsection (a). For purposes of these Amended and Restated Certificate of Incorporation, "Series B Original Issue Price" shall mean \$0.6877 per share for each share of the Series B Preferred Stock (as adjusted for any stock splits, stock dividends, combinations, recapitalizations or the like with respect to the Series B Preferred Stock).

    (b)    Upon the completion of the distribution required by subsection (a) of this Section 2, the holders of Series C Preferred Stock shall be entitled to receive, prior and in preference to any distribution of any Proceeds to the holders of the Series A Preferred Stock or the Common Stock, and after the holders of the Series B Preferred Stock, by reason of their ownership thereof, an amount per share equal to the Series C Original Price (as defined below), plus declared but unpaid dividends on such share. If, upon the occurrence of such event, the Proceeds thus distributed among the holders of the Series C Preferred Stock shall be insufficient to permit the payment to such holders of the full aforesaid preferential amounts, then the entire Proceeds legally available for distribution shall be distributed ratably among the holders of the Series C Preferred Stock in proportion to the full preferential amount that each such holder is otherwise entitled to receive under this subsection (b). For purposes of these Amended and Restated Certificate of Incorporation, "Series C Original Issue Price" shall mean \$0.6877 per share for each share of the Series C Preferred Stock (as adjusted for any stock splits, stock dividends, combinations, recapitalizations or the like with respect to the Series C Preferred Stock).

    (c)    Upon the completion of the distribution required by subsections (a) and (b) of this Section 2, the holders of Series A Preferred Stock shall be entitled to receive, prior and in preference to any distribution of any Proceeds to the holders of the Common Stock, by reason of their ownership thereof, \$0.10 per share for each share of the Series A Preferred Stock (as adjusted for any stock splits, stock dividends, combinations, recapitalizations or the like with respect to the Series A Preferred Stock), plus declared but unpaid dividends on such share. If, upon the occurrence of such event, the Proceeds thus distributed among the holders of the Series A Preferred Stock shall be insufficient to permit the payment to such holders of the full aforesaid preferential amounts, then the entire Proceeds legally available for distribution shall be distributed ratably among the holders of the Series A Preferred Stock in proportion to the full preferential amount that each such holder is otherwise entitled to receive under this subsection (c). Upon the completion of the distribution required by subsection (a), (b) and the first and second sentence of this subsection (c) of this Section 2, any remaining Proceeds available for distribution to shareholders shall be distributed among the holders of Common Stock pro rata, based on the number of shares of Common Stock held by each (assuming full conversion of all such Preferred Stock).

4

(d)      Notwithstanding the above, for purposes of determining the amount each holder of shares of Preferred Stock is entitled to receive with respect to a Liquidation Event, each such holder of shares of a series of Preferred Stock shall be deemed to have converted (regardless of whether such holder actually converted) such holder's shares of such series into shares of Common Stock immediately prior to the Liquidation Event (without regard to any limitations on the conversion of the Preferred Stock contained in these Amended and Restated Certificate of Incorporation) if, as a result of an actual conversion, such holder would receive, in the aggregate, an amount greater than the amount that would be distributed to such holder if such holder did not convert such series of Preferred Stock into shares of Common Stock. If any such holder shall be deemed to have converted shares of Preferred Stock into Common Stock pursuant to this paragraph, then such holder shall not be entitled to receive any distribution that would otherwise be made to holders of Preferred Stock that have not converted (or have not been deemed to have converted) into shares of Common Stock.

(e)      (i) For purposes of this Section 2, a "Liquidation Event" shall include (A) the closing of the sale, transfer or other disposition of all or substantially all of this corporation's assets, (B) the consummation of the merger or consolidation of this corporation with or into another entity (except a merger or consolidation in which the holders of capital stock of this corporation immediately prior to such merger or consolidation continue to hold at least 50% of the voting power of the capital stock of this corporation or the surviving or acquiring entity), (C) the closing of the transfer (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons (other than an underwriter of this corporation's securities), of this corporation's securities if, after such closing, such person or group of affiliated persons would hold 50% or more of the outstanding voting stock of this corporation or (D) a liquidation, dissolution or winding up of this corporation; provided, however, that a transaction shall not constitute a Liquidation Event if its sole purpose is to change the state of this corporation's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held this corporation's securities immediately prior to such transaction. Notwithstanding the prior sentence, the sale of shares of Series B Preferred Stock or Series C Preferred Stock in a financing transaction shall not be deemed a "Liquidation Event." The treatment of any particular transaction or series of related transactions as a Liquidation Event may be waived by the vote or written consent of the holders of a majority of each outstanding class or series of Preferred Stock.

5

(ii)          In any Liquidation Event, if the consideration received by this corporation is other than cash, its value will be deemed its fair market value as determined in good faith by the corporation's Board of Directors (the "Board of Directors") of this corporation. Any securities shall be valued as follows:

(A)          Securities not subject to investment letter or other similar restrictions on free marketability covered by (B) below:

(1)          If traded on a securities exchange or through the Nasdaq, the value shall be deemed to be the average of the closing prices of the securities on such exchange or system over the twenty (20) trading day period ending three (3) trading days prior to the closing;

(2)          If actively traded over-the-counter, the value shall be deemed to be the average of the closing bid or sale prices (whichever is applicable) over the twenty (20) trading day period ending three (3) trading days prior to the closing; and

(3)          If there is no active public market, the value shall be the fair market value thereof, as mutually determined by the Board of Directors of this corporation and the holders of at least a majority of the voting power of each class or series of outstanding Preferred Stock.

(B)          The method of valuation of securities subject to investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a shareholder's status as an affiliate or former affiliate) shall be to make an appropriate discount from the market value determined as above in (A) (1), (2) or (3) to reflect the approximate fair market value thereof, as mutually determined by this corporation and the holders of at least a majority of the voting power of each class or series of outstanding Preferred Stock.

(C)          The foregoing methods for valuing non-cash consideration to be distributed in connection with a Liquidation Event may be superseded by any determination of such value set forth in the definitive agreements governing such Liquidation Event.

(iii)        In the event the requirements of this Section 2 are not complied with, this corporation shall forthwith either:

(A)          cause such closing to be postponed until such time as the requirements of this Section 2 have been complied with; or

6

(B)        cancel such transaction, in which event the rights, preferences and privileges of the holders of the Preferred Stock shall revert to and be the same as such rights, preferences and privileges existing immediately prior to the date of the first notice referred to in subsection 2(d)(iv) hereof.

(iv)        This corporation shall give each holder of record of Preferred Stock written notice of such impending transaction not later than twenty (20) days prior to the shareholders' meeting called to approve such transaction, or twenty (20) days prior to the closing of such transaction, whichever is earlier, and shall also notify such holders in writing of the final approval of such transaction. The first of such notices shall describe the material terms and conditions of the impending transaction and the provisions of this Section 2, and this corporation shall thereafter give such holders prompt notice of any changes. The transaction shall in no event take place sooner than twenty (20) days after this corporation has given the first notice provided for herein or sooner than ten (10) days after this corporation has given notice of any changes provided for herein; provided, however, that such periods may be shortened upon the written consent of the holders of Preferred Stock that (i) are entitled to such notice rights or similar notice rights and (ii) represent at least a majority of the voting power of all then outstanding shares of such class or series of Preferred Stock. The holders of the outstanding Preferred Stock can waive the notice requirements described in this subsection (iv) upon the affirmative vote or written consent of the holders of at least a majority of the shares of each class or series of Preferred Stock then outstanding.

3.        Redemption.

(a)        Subject to the conditions and other provisions of this Article III(B)3(a), this corporation shall have the right to elect to redeem, out of funds legally available therefore, all (but not less than all) of the then outstanding shares of the Series C Preferred Stock in accordance with the following conditions:

(i)        at any time for a price per share equal to the Series C Original Issue Price, plus all unpaid accrued and accumulated dividends on such share (whether or not declared) (the "Series C Redemption Price"), provided: (A) the Series C Preferred Stock has been issued and outstanding for a period of at least one (1) year, (B) the issuance of the shares of Common Stock underlying the Series C Preferred Stock has been registered pursuant to the Securities Act of 1933 and such registration remains effective, and (C) the trading price for this corporation's Common Stock is less than the Series C Conversion Price for twenty (20) trading days in any period of thirty (30) consecutive trading days on the Nasdaq Capital Markets; or

7

(ii)    in accordance with the following schedule; provided the issuance of shares of Common Stock underlying the Series C Preferred Stock has been registered pursuant to the Securities Act of 1933 and such registration remains effective:

| Year 1 | No Redemption |
|---|---|
| Year 2 | Redemption at 120% of the Series C Redemption Price |
| Year 3 | Redemption at 115% of the Series C Redemption Price |
| Year 4 | Redemption at 110% of the Series C Redemption Price |
| Year 5 | Redemption at 105% of the Series C Redemption Price |
| Year 6 and thereafter | Redemption at 100% of the Series C Redemption Price |

Any such redemption shall occur not less than fifteen (15) days following receipt by the holders of the Series C Preferred Stock of a written election notice (the "Series C Election Notice") from this corporation stating this corporation's intent to exercise this election and the date upon which such redemption shall take effect (the "Series C Redemption Date"). Upon receipt of a Series C Election Notice, all holders of the Series C Preferred Stock shall be deemed to have consented to have all of their shares of the Series C Preferred Stock redeemed pursuant to this Article III(B)3(a); provided, that notwithstanding anything to the contrary contained herein, each holder of shares of Series C Preferred Stock shall have the right to elect prior to the Series C Redemption Date to give effect to the conversion rights contained in Article III(B)4 instead of giving effect to the provisions contained in this Article III(B)3(a) with respect to the shares of Series C Preferred Stock held by such holder. (b) The Series A Preferred Stock and Series B Preferred Stock are not redeemable.

4.    <u>Conversion</u>. The holders of the Preferred Stock shall have conversion rights as follows (the "Conversion Rights"):

(a)    <u>Right to Convert</u>. Each share of Series B Preferred Stock and each share of Series C Preferred Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share, at the office of this corporation or any transfer agent for such stock, into such number of fully paid and nonassessable shares of Common Stock as is determined by dividing the Series B Original Issue Price or Series C Original Issue Price (plus all unpaid accrued and accumulated dividends thereon, as applicable, whether or not declared), by the Series B Conversion Price or Series C Conversion Price, as applicable (in each case, the "Conversion Rate"), determined as hereafter provided, in effect on the date the certificate is surrendered for conversion. The initial "Series B Conversion Price" shall be the Series B Original Issue Price and the initial "Series C Conversion Price" shall be the Series C Original Issue Price; provided, however, that the Series B Conversion Price and the Series C Conversion Price shall be subject to adjustment as set forth in this Section 4. Each share of Series A Preferred Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share, at the office of this corporation or any transfer agent for such stock, into one hundred (100) fully paid and nonassessable shares of Common Stock (as adjusted for any stock splits, stock dividends, combinations, recapitalizations or the like with respect to the Common Stock).

8

(b)     Automatic Conversion.

(i)     Subject to subsection 4(d) below, each share of Series C Preferred Stock shall automatically be converted into shares of Common Stock at the applicable Conversion Rate at the time in effect immediately upon (A) the issuance of shares of Common Stock underlying the Series C Preferred Stock being registered pursuant to the Securities Act of 1933 and such registration remaining effective, (B) the trading price for this corporation's Common Stock being more than two times the Series C Conversion Price for twenty (20) trading days in any period of thirty (30) consecutive trading days on the Nasdaq Capital Market, and (C) the average daily trading dollar volume of this corporation's Common Stock during such twenty (20) trading days is equal to or greater than $4.0 million.

(ii)     Subject to subsection 4(d) below, each share of Series B Preferred Stock shall automatically be converted into shares of Common Stock at the applicable Conversion Rate at the time in effect immediately upon the earlier of (i) this corporation's sale of its Common Stock in a firm commitment underwritten public offering pursuant to a registration statement on Form S-1 or Form S-3 under the Securities Act of 1933, as amended, the public offering price of which was not less than $100,000,000 in the aggregate (a "Qualified Public Offering") or (ii) the date specified by written consent or agreement of the holders of the then outstanding shares of Series B Preferred Stock.

(iii)     Each share of Series A Preferred Stock shall automatically be converted into shares of Common Stock on a 100-for-1 basis (as adjusted for any stock splits, stock dividends, combinations, recapitalizations or the like with respect to the Common Stock) upon the earlier of (i) a Qualified Public Offering or (ii) the date specified by written consent or agreement of the holders of the then outstanding shares of Series A Preferred Stock.

9

(c)        Mechanics of Conversion. Before any holder of Preferred Stock shall be entitled to voluntarily convert the same into shares of Common Stock, he or she shall surrender the certificate or certificates therefor, duly endorsed, at the office of this corporation or of any transfer agent for the Preferred Stock, and shall give written notice to this corporation at its principal corporate office, of the election to convert the same and shall state therein the name or names in which the certificate or certificates for shares of Common Stock are to be issued. This corporation shall, as soon as practicable thereafter, issue and deliver at such office to such holder of Preferred Stock, or to the nominee or nominees of such holder, a certificate or certificates for the number of shares of Common Stock to which such holder shall be entitled as aforesaid. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Preferred Stock to be converted, and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock as of such date. If the conversion is in connection with an underwritten offering of securities registered pursuant to the Securities Act of 1933, the conversion may, at the option of any holder tendering Preferred Stock for conversion, be conditioned upon the closing with the underwriters of the sale of securities pursuant to such offering, in which event the persons entitled to receive the Common Stock upon conversion of the Preferred Stock shall not be deemed to have converted such Preferred Stock until immediately prior to the closing of such sale of securities. If the conversion is in connection with Automatic Conversion provisions of subsection 4(b)(ii) above, such conversion shall be deemed to have been made on the conversion date described in the shareholder consent approving such conversion, and the persons entitled to receive shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holders of such shares of Common Stock as of such date.

(d)        Limitations on Conversion. Notwithstanding anything to the contrary contained in these Amended and Restated Certificate of Incorporation, the Series B Preferred Stock and Series C Preferred Stock shall not be convertible by a holder to the extent (but only to the extent) that the holder or any of its Affiliates would beneficially own in excess of 9.99% (the "Maximum Percentage") of the Common Stock. To the extent the above limitation applies, the determination of whether the holder's Series B Preferred Stock or Series C Preferred Stock shall be convertible (vis-a-vis other convertible securities owned by the holder or any of its Affiliates) and of which such securities shall be convertible (as among all such securities owned by the holder) shall, subject to such Maximum Percentage limitation, be determined on the basis of the first submission to the corporation for conversion. No prior inability to convert the Series B Preferred Stock or Series C Preferred Stock pursuant to this paragraph shall have any effect on the applicability of the provisions of this paragraph with respect to any subsequent determination of convertibility. For the purposes of this paragraph, beneficial ownership and all determinations and calculations (including, without limitation, with respect to calculations of percentage ownership) shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder. The provisions of this paragraph shall be implemented in a manner otherwise than in strict conformity with the terms of this paragraph to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended Maximum Percentage beneficial ownership limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such Maximum Percentage limitation. The limitations contained in this paragraph shall apply to a successor holder of the Series B Preferred Stock or a successor holder of the Series C Preferred Stock, as applicable. The holders of Common Stock shall be third party beneficiaries of this paragraph and the corporation may not amend or waive this paragraph without the consent of holders of a majority of its Common Stock. For any reason at any time, upon the written or oral request of the holder, the corporation shall within one (1) Business Day confirm orally and in writing to the holder the number of shares of Common Stock then outstanding, including by virtue of any prior conversion of convertible securities into Common Stock, including, without limitation, pursuant to these Amended and Restated Certificate of Incorporation or securities issued pursuant to these Amended and Restated Certificate of Incorporation. By written notice to the corporation, any holder may increase or decrease the Maximum Percentage to any other percentage not in excess of 9.99% specified in such notice; provided that (i) any such increase will not be effective until the 61st day after such notice is delivered to the corporation, and (ii) any such increase or decrease will apply only to such holder sending such notice and not to any other holder.

10

(e)     Conversion Price Adjustments of Series B Preferred Stock and Series C Preferred Stock for Certain Dilutive Issuances, Splits and Combinations. The Series B Conversion Price and the Series C Conversion Price shall be subject to adjustment from time to time as follows:

(i)     (A)     If this corporation shall issue, on or after the date upon which these Amended and Restated Certificate of Incorporation are accepted for filing by the Secretary of State of the State of California (the "Filing Date"), any Additional Stock (as defined below) without consideration or for a consideration per share less than the Series B Conversion Price and/or Series C Conversion Price, as applicable, in effect immediately prior to the issuance of such Additional Stock, the Series B Conversion Price and/or Series C Conversion Price, as applicable, in effect immediately prior to each such issuance shall forthwith (except as otherwise provided in this clause (i)) be adjusted to a price determined by multiplying the Series B Conversion Price and/or Series C Conversion Price, as applicable, by a fraction, the numerator of which shall be (1) the number of shares of Common Stock Outstanding immediately prior to such issuance plus (2) the number of shares of Common Stock that the aggregate consideration received by this corporation for such issuance would purchase at the then-existing Series B Conversion Price and/or Series C Conversion Price, as applicable; and the denominator of which shall be the number of shares of Common Stock Outstanding immediately prior to such issuance plus the number of shares of such Additional Stock. For purposes of this subsection 4(e)(i)(A), the term "Common Stock Outstanding" shall mean and include the following: (1) outstanding Common Stock, (2) Common Stock issuable upon conversion of outstanding Preferred Stock (without regard to any limitations on the conversion of the Preferred Stock contained in these Amended and Restated Certificate of Incorporation), (3) Common Stock issuable upon exercise of outstanding stock options, and (4) Common Stock issuable upon exercise (and, in the case of warrants to purchase Preferred Stock, conversion) of outstanding warrants. Shares described in (1) through (4) above shall be included whether vested or unvested, whether contingent or non-contingent and whether exercisable or not yet exercisable.

11

(B)    No adjustment of the Series B Conversion Price and/or Series C Conversion Price shall be made in an amount less than one cent per share, provided that any adjustments that are not required to be made by reason of this sentence shall be carried forward and shall be either taken into account in any subsequent adjustment made prior to three (3) years from the date of the event giving rise to the adjustment being carried forward, or shall be made at the end of three (3) years from the date of the event giving rise to the adjustment being carried forward. Except to the limited extent provided for in subsections (E)(3) and (E)(4), no adjustment of such Conversion Price pursuant to this subsection 4(e)(i) shall have the effect of increasing the Conversion Price above the Conversion Price in effect immediately prior to such adjustment.

(C)    In the case of the issuance of Common Stock for cash, the consideration shall be deemed to be the amount of cash paid therefor before deducting any reasonable discounts, commissions or other expenses allowed, paid or incurred by this corporation for any underwriting or otherwise in connection with the issuance and sale thereof.

(D)    In the case of the issuance of the Common Stock for a consideration in whole or in part other than cash, the consideration other than cash shall be deemed to be the fair value thereof as determined in good faith by the Board of Directors, irrespective of any accounting treatment.

(E)    In the case of the issuance of options to purchase or rights to subscribe for Common Stock, securities by their terms convertible into or exchangeable for Common Stock, or options to purchase or rights to subscribe for such convertible or exchangeable securities, the following provisions shall apply for all purposes of this subsection 4(e)(i) and subsection 4(e)(ii):

(1)    The aggregate maximum number of shares of Common Stock deliverable upon exercise (assuming the satisfaction of any conditions to exercisability, including without limitation, the passage of time, but without taking into account potential antidilution adjustments) of such options to purchase or rights to subscribe for Common Stock shall be deemed to have been issued at the time such options or rights were issued and for a consideration equal to the consideration (determined in the manner provided in subsections 4(e)(i)(C) and (e)(i) (D)), if any, received by this corporation upon the issuance of such options or rights plus the minimum exercise price provided in such options or rights (without taking into account potential antidilution adjustments) for the Common Stock covered thereby.

12

(2)        The aggregate maximum number of shares of Common Stock deliverable upon conversion of, or in exchange for (assuming the satisfaction of any conditions to convertibility or exchangeability, including, without limitation, the passage of time, but without taking into account potential antidilution adjustments), any such convertible or exchangeable securities or upon the exercise of options to purchase or rights to subscribe for such convertible or exchangeable securities and subsequent conversion or exchange thereof, shall be deemed to have been issued at the time such securities were issued or such options or rights were issued and for a consideration equal to the consideration, if any, received by this corporation for any such securities and related options or rights (excluding any cash received on account of accrued interest or accrued dividends), plus the minimum additional consideration, if any, to be received by this corporation (without taking into account potential antidilution adjustments) upon the conversion or exchange of such securities or the exercise of any related options or rights (the consideration in each case to be determined in the manner provided in subsections 4(e)(i)(C) and (e)(i)(D)).

(3)        In the event of any change in the number of shares of Common Stock deliverable or in the consideration payable to this corporation upon exercise of such options or rights or upon conversion of or in exchange for such convertible or exchangeable securities, including, but not limited to, a change resulting from the antidilution provisions thereof; the Series B Conversion Price and/or Series C Conversion Price, as applicable, to the extent in any way affected by or computed using such options, rights or securities, shall be recomputed to reflect such change, but no further adjustment shall be made for the actual issuance of Common Stock or any payment of such consideration upon the exercise of any such options or rights or the conversion or exchange of such securities.

13

(4)     Upon the expiration of any such options or rights, the termination of any such rights to convert or exchange or the expiration of any options or rights related to such convertible or exchangeable securities, the Series B Conversion Price and/or Series C Conversion Price, as applicable, to the extent in any way affected by or computed using such options, rights or securities or options or rights related to such securities, shall be recomputed to reflect the issuance of only the number of shares of Common Stock (and convertible or exchangeable securities that remain in effect) actually issued upon the exercise of such options or rights, upon the conversion or exchange of such securities or upon the exercise of the options or rights related to such securities.

(5)     The number of shares of Common Stock deemed issued and the consideration deemed paid therefor pursuant to subsections 4(e)(i)(E)(1) and (2) shall be appropriately adjusted to reflect any change, termination or expiration of the type described in either subsection 4(e)(i)(E)(3) or (4).

(ii)     "Additional Stock" shall mean any shares of Common Stock issued (or deemed to have been issued pursuant to subsection 4(e)(i)(E)) by this corporation on or after the Filing Date other than:

(A)     Common Stock issued pursuant to a transaction described in subsection 4(e)(iii) hereof;

(B)     Common Stock issued to employees, directors, consultants and other service providers for the primary purpose of soliciting or retaining their services pursuant to plans or agreements approved by this corporation's Board of Directors, provided, however, that the total number of shares exempt pursuant to this sub-section shall not exceed 10% of the corporation's total number of shares of Common Stock issued and outstanding on a fully diluted basis at such time of issuance;

(C)     Common Stock issued pursuant to a Qualified Public Offering;

(D)     Common Stock issued pursuant to the conversion or exercise of convertible or exercisable securities outstanding on the Filing Date;

(E)     Common Stock issued in connection with a bona fide business acquisition of or by this corporation, whether by merger, consolidation, sale of assets, sale or exchange of stock or otherwise;

(F)     Common Stock issued or deemed issued pursuant to subsection 4(e)(i)(E) as a result of a decrease in the Conversion Price of any series of Preferred Stock resulting from the operation of this subsection 4(e);

14

(G)     Common Stock issued or deemed issued in connection with bank debt, equipment leases or similar credit facilities, provided such issuances are for other than primarily equity financing purposes and approved by the Board of Directors; or

(H)     Common Stock issued upon conversion of the Preferred Stock.

(iii)     In the event this corporation should at any time or from time to time after the Filing Date fix a record date for the effectuation of a split or subdivision of the outstanding shares of Common Stock without a corresponding split or subdivision of the Series B Preferred Stock and/or Series C Preferred Stock, as applicable, or the determination of holders of Common Stock entitled to receive a dividend or other distribution payable in additional shares of Common Stock or other securities or rights convertible into, or entitling the holder thereof to receive directly or indirectly, additional shares of Common Stock (hereinafter referred to as "Common Stock Equivalents") without payment of any consideration by such holder for the additional shares of Common Stock or the Common Stock Equivalents (including the additional shares of Common Stock issuable upon conversion or exercise thereof), then, as of such record date (or the date of such dividend distribution, split or subdivision if no record date is fixed), the Conversion Price of the Series B Preferred Stock and/or Series C Preferred Stock, as applicable, shall be appropriately decreased so that the number of shares of Common Stock issuable on conversion of each share of such series shall be increased in proportion to such increase of the aggregate of shares of Common Stock outstanding and those issuable with respect to such Common Stock Equivalents with the number of shares issuable with respect to Common Stock Equivalents determined from time to time in the manner provided for deemed issuances in subsection 4(e)(i)(E).

(iv)     If the number of shares of Common Stock outstanding at any time after the Filing Date is decreased by a combination of the outstanding shares of Common Stock, without a corresponding decrease of the Series B Preferred Stock and/or Series C Preferred Stock, as applicable, then, following the record date of such combination, the Series B Conversion Price and/or Series C Conversion Price, as applicable, shall be appropriately increased so that the number of shares of Common Stock issuable on conversion of each share of such series shall be decreased in proportion to such decrease in outstanding shares.

15

(f)     <u>Other Distributions</u>. In the event this corporation shall declare a distribution payable in securities of other persons, evidences of indebtedness issued by this corporation or other persons, assets (excluding cash dividends) or options or rights not referred to in subsection 4(e)(iii), then, in each such case for the purpose of this subsection 4(f), the holders of the Preferred Stock shall be entitled to a proportionate share of any such distribution as though they were the holders of the number of shares of Common Stock of this corporation into which their shares of Preferred Stock are convertible as of the record date fixed for the determination of the holders of Common Stock of this corporation entitled to receive such distribution without regard to any limitations on the conversion of the Preferred Stock contained in these Amended and Restated Certificate of Incorporation.

(g)     <u>Recapitalizations</u>. If at any time or from time to time there shall be a recapitalization of the Common Stock (other than a subdivision, combination or merger or sale of assets transaction provided for elsewhere in this Section 4 or Section 2) the holders of the Preferred Stock shall thereafter be entitled to receive upon conversion of the Preferred Stock the number of shares of stock or other securities or property of this corporation or otherwise, to which a holder of Common Stock deliverable upon conversion would have been entitled on such recapitalization. In any such case, appropriate adjustment shall be made in the application of the provisions of this Section 4 with respect to the rights of the holders of the Preferred Stock after the recapitalization to the end that the provisions of this Section 4 (including adjustment of the Series B Conversion Price and/or Series C Conversion Price then in effect and the number of shares purchasable upon conversion of the Preferred Stock) shall be applicable after that event as nearly equivalent as may be practicable.

(h)     <u>No Fractional Shares and Certificate as to Adjustments</u>.

(i)     No fractional shares shall be issued upon the conversion of any share or shares of the Preferred Stock and the aggregate number of shares of Common Stock to be issued to particular shareholders, shall either, at the corporation's option, be rounded (A) up to the nest whole share or (b) down to the nearest whole share and the corporation shall pay in cash the fair value of any fractional shares as of the time when entitled to receive such fractions are determined, provided, however, that the corporation may not round down if the nearest whole share is less than one (1).

(ii)     Upon the occurrence of each adjustment or readjustment of the Series B Conversion Price and/or Series C Conversion Price pursuant to this Section 4, this corporation, at its expense, shall promptly compute such adjustment or readjustment in accordance with the terms hereof and prepare and furnish to each holder of Series B Preferred Stock and/or Series C Preferred Stock, as applicable, a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. This corporation shall furnish or cause to be furnished to such holder a like certificate setting forth (A) such adjustment and readjustment, (B) the Series B Conversion Price and/or Series C Conversion Price, as applicable, at the time in effect, and (C) the number of shares of Common Stock and the amount, if any, of other property that at the time would be received upon the conversion of a share of Series B Preferred Stock and/or Series C Preferred Stock, as applicable.

(i) Notices of Record Date. In the event of any taking by this corporation of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend (other than a cash dividend) or other distribution, this corporation shall mail to each holder of Preferred Stock, at least ten (10) days prior to the date specified therein, a notice specifying the date on which any such record is to be taken for the purpose of such dividend, distribution, and the amount and character of such dividend or distribution.

(j) Reservation of Stock Issuable Upon Conversion. This corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the shares of the Preferred Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of the Preferred Stock (without regard to any limitations on the conversion of the Preferred Stock contained in these Amended and Restated Certificate of Incorporation); and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock, in addition to such other remedies as shall be available to the holder of such Preferred Stock, this corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purposes, including, without limitation, engaging in best efforts to obtain the requisite shareholder approval of any necessary amendment to these Amended and Restated Certificate of Incorporation.

(k) Notices. Any notice required by the provisions of this Section 4 to be given to the holders of shares of Preferred Stock shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to each holder of record at his address appearing on the books of this corporation.

(l) Waiver of Adjustment to Conversion Price. Notwithstanding anything herein to the contrary, any downward adjustment of the Series B Conversion Price and/or Series C Conversion Price, as applicable, may be waived, either prospectively or retroactively or in a particular instance, by the consent or vote of all holders of the outstanding shares of Series B Preferred Stock (with regard to the Series B Conversion Price) or Series C Preferred Stock (with regard to the Series C Conversion Price). Any such waiver shall bind all future holders of shares of Series B Preferred Stock and/or Series C Preferred Stock, as applicable.

17

5.      Voting Rights. The holder of each share of Series B Preferred Stock and each share of Series C Preferred Stock shall have the right to one vote for each share of Common Stock into which such Series B Preferred Stock and/or Series C Preferred Stock, as applicable, could then be converted, and with respect to such vote, such holder shall have full voting rights and powers equal to the voting rights and powers of the holders of Common Stock, and shall be entitled, notwithstanding any provision hereof, to notice of any shareholders' meeting in accordance with the bylaws of this corporation, shall be entitled to vote, together with holders of Common Stock, with respect to any question upon which holders of Common Stock have the right to vote. The holder of each share of Series A Preferred Stock shall have the right to one thousand (1,000) votes for each share of Series A Preferred Stock, and with respect to such vote, such holder shall have full voting rights and powers equal to the voting rights and powers of the holders of Common Stock, and shall be entitled, notwithstanding any provision hereof, to notice of any shareholders' meeting in accordance with the bylaws of this corporation, shall be entitled to vote, together with holders of Common Stock, with respect to any question upon which holders of Common Stock have the right to vote. Fractional votes shall not, however, be permitted and any fractional voting rights available on an as-converted basis (after aggregating all shares into which shares of Preferred Stock held by each holder could be converted) shall be rounded to the nearest whole number (with one-half being rounded upward).

6.      Protective Provisions.

(a)      This corporation shall not consummate a Liquidation Event without first obtaining the approval (by vote or written consent, as provided by law) of the holders of each of a majority of the then outstanding shares of Series B Preferred Stock, Series C Preferred Stock and Series A Preferred Stock, voting separately;

(b)      This corporation shall not, without first obtaining the approval (by vote or written consent, as provided by law) of the holders of each of a majority of the then outstanding shares of Series B Preferred Stock and Series C Preferred Stock, voting separately:

(i)      authorize or issue, or obligate itself to issue, any equity security (including any other security convertible into or exercisable for any such equity security) having a preference over or parity with the Series B Preferred Stock and/or Series C Preferred Stock, as applicable, with respect to dividends, liquidation, redemption or voting;

(ii)      amend these Amended and Restated Certificate of Incorporation or the corporation's bylaws to adversely affect the rights, preferences and privileges of the Series B Preferred Stock and/or Series C Preferred Stock, as applicable;

(iii)      enter into, or consummate the merger or consolidation of this corporation with or into another entity, or

(iv)      Any voluntary dissolution, liquidation or winding up of the affairs of the corporation or voluntary petition for bankruptcy or assignment for the benefit of creditors.

18

(c)     This corporation shall not, without first obtaining the approval (by vote or written consent, as provided by law) of the holders of a majority of the then outstanding shares of Series A Preferred Stock:

(i)     authorize or issue, or obligate itself to issue, any equity security (including any other security convertible into or exercisable for any such equity security) having a preference over the Series A Preferred Stock with respect to dividends, liquidation, redemption or having a preference over or parity with the Series A Preferred Stock with respect to voting; or

(ii)     amend this corporation's Certificate of Incorporation or bylaws to materially adversely affect the rights, preferences and privileges of the Series A Preferred Stock.

7.     Status of Converted Stock. In the event any shares of Preferred Stock shall be converted pursuant to Section 4 hereof, the shares so converted shall be cancelled and shall not be issuable by this corporation. The Amended and Restated Certificate of Incorporation of this corporation shall be appropriately amended to effect the corresponding reduction in this corporation's authorized capital stock.

C.     Common Stock. The rights, preferences, privileges and restrictions granted to and imposed on the Common Stock are as set forth below in this Article III(C).

1.     Dividend Rights. Subject to the prior rights of holders of all classes of stock at the time outstanding having prior rights as to dividends, the holders of the Common Stock shall be entitled to receive, when and as declared by the Board of Directors, out of any assets of this corporation legally available therefor, such dividends as may be declared from time to time by the Board of Directors.

2.     Liquidation Rights. Upon the liquidation, dissolution or winding up of this corporation, the assets of this corporation shall be distributed as provided in Section 2 of Article III(B) hereof.

3.     Redemption. The Common Stock is not redeemable at the option of the holder.

4.     Voting Rights. The holder of each share of Common Stock shall have the right to one vote for each such share, and shall be entitled to notice of any shareholders' meeting in accordance with the bylaws of this corporation, and shall be entitled to vote upon such matters and in such manner as may be provided by law.

## ARTICLE IV

The following provisions are inserted for the management of the business and the conduct of the affairs of the Corporation, and for further definition, limitation and regulation of the powers of the Corporation and of its directors and stockholders:

A.     The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. In addition to the powers and authority expressly conferred upon them by statute or by this Second Amended and Restated Certificate of Incorporation or the Bylaws of the Corporation, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation.

B.      The directors of the Corporation need not be elected by written ballot unless the Bylaws so provide.

C.      Special meetings of stockholders of the Corporation may be called only by the Board of Directors, the Chairman of the Board, the Chief Executive Officer, or the President (in the absence of a Chief Executive Officer).

## ARTICLE V

A.      The number of directors shall initially be seven (7) and, thereafter, shall be fixed from time to time exclusively by the Board of Directors pursuant to a resolution adopted by a majority of the total number of authorized directors (whether or not there exist any vacancies in previously authorized directorships at the time any such resolution is presented to the Board for adoption). Each director shall serve until his successor is duly elected and qualified or until his death, resignation or removal.

B.      Subject to the rights of the holders of any series of Preferred Stock to elect additional directors under specified circumstances, the directors shall be divided, with respect to the time for which they severally hold office, into three classes designated as Class I, Class II and Class III, respectively (the "Classified Board"). The Board may assign members of the Board already in office to the Classified Board, which assignments shall become effective at the same time the Classified Board becomes effective. Directors shall be assigned to each class in accordance with a resolution or resolutions adopted by the Board, with the number of directors in each class to be divided as nearly equal as reasonably possible. The initial term of office of the Class I directors shall expire at the Corporation's first annual meeting of stockholders following the date hereof, the initial term of office of the Class II directors shall expire at the Corporation's second annual meeting of stockholders following the date hereof and the initial term of office of the Class III directors shall expire at the Corporation's third annual meeting of stockholders following the date hereof. At each annual meeting of stockholders following the date hereof, directors elected to succeed those directors of the class whose terms then expire shall be elected for a term of office to expire at the third succeeding annual meeting of stockholders after their election.

C.      There shall be no cumulative voting in the election of directors. Election of directors need not be by written ballot unless the bylaws of the Corporation so provide.

D.      Newly created directorships resulting from any increase in the authorized number of directors or any vacancies in the Board of Directors resulting from death, resignation or other cause (including removal from office by a vote of the stockholders) may be filled only by a majority vote of the directors then in office, though less than a quorum, or by the sole remaining director, and directors so chosen shall hold office for a term expiring at the next annual meeting of stockholders at which the term of office of the class to which they have been elected expires, and until their respective successors are elected, except in the case of the death, resignation or removal of any director. No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director.

E.      Any directors, or the entire Board of Directors, may be removed from office at any time, but only for cause and only by the affirmative vote of the holders of a majority of the voting power of all of the then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

## ARTICLE VI

## [IN1ENTIONALLY OMITTED]

## ARTICLE VII

The Board of Directors is expressly empowered to adopt, amend, alter or repeal the Bylaws of the Corporation. The stockholders shall also have power to adopt, amend, alter or repeal the Bylaws of the Corporation. Any adoption, amendment, alteration or repeal of the Bylaws of the Corporation by the stockholders shall require, in addition to any vote of the holders of any class or series of stock of the Corporation required by law or by this Second Amended and Restated Certificate of Incorporation, the affirmative vote of the holders of at least sixty-six and two-thirds percent (66-2/3%) of the voting power of all of the then outstanding shares of the capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

## ARTICLE VIII

A.      A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involved intentional misconduct or a knowing violation of law, (iii) under Section 174 of the D.G.C.L., or (iv) for any transaction from which the director derived an improper personal benefit.

B.      If the D.G.C.L. is hereafter amended to authorize the further elimination or limitation of the liability of a director, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the D.G.C.L., as so amended. Any repeal or modification of the foregoing provisions of this ARTICLE VIII by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to actions or omissions occurring prior to, such repeal or modification.

21

**ARTICLE IX**

A.        Each person (and the heirs, executors or administrators of such person) who was or is a party or is threatened to be made a party to, or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware Law. The right to indemnification conferred in this ARTICLE IX shall also include the right to be paid by the Corporation the expenses incurred in connection with any such proceeding in advance of its final disposition to the fullest extent authorized by Delaware Law. The right to indemnification conferred in this ARTICLE IX shall be a contract right.

B.        The Corporation may, by action of its Board of Directors, provide indemnification to such of the employees and agents of the Corporation to such extent and to such effect as the Board of Directors shall determine to be appropriate and authorized by Delaware Law.

C.        The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss incurred by such person in any such capacity or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under Delaware Law.

D.        The rights and authority conferred in this ARTICLE IX shall not be exclusive of any other right which any person may otherwise have or hereafter acquire. Neither the amendment nor repeal of this ARTICLE IX, nor the adoption of any provision of this Second Amended and Restated Certificate of Incorporation or the Bylaws of the Corporation, nor, to the fullest extent permitted by Delaware Law, any modification of law, shall eliminate or reduce the effect of this ARTICLE IX in respect of any acts or omissions occurring prior to such amendment, repeal, adoption or modification.

**ARTICLE X**

To the fullest extent permitted by law, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director or officer of the corporation to the corporation or the corporation's stockholders, (iii) any action asserting a claim against the corporation arising pursuant to any provision of the D.G.C.L. or the Corporation's Second Amended and Restated Certificate of Incorporation or Bylaws, or (iv) any action asserting a claim against the Corporation governed by the internal affairs doctrine.

22

**ARTICLE XI**

The Corporation reserves the right to amend or repeal any provision contained in this Second Amended and Restated Certificate of Incorporation in any manner now or hereafter permitted by the laws of the State of Delaware and all rights of the stockholders of the Corporation are granted subject to this reservation; provided, however, that, notwithstanding any other provision of this Second Amended and Restated Certificate of Incorporation or any provision of law which might otherwise permit a lesser vote or no vote, but in addition to any vote of the holders of any class or series of the stock of this Corporation required by law or by this Second Amended and Restated Certificate of Incorporation, the affirmative vote of the holders of at least sixty-six and two-thirds percent (66-2/3%) of the voting power of all of the then outstanding shares of the capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required to amend or repeal this ARTICLE XI or ARTICLE VII.

\*\*\*

23

IN WITNESS WHEREOF, this Second Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of this corporation on this 5th day of November, 2021.

MULLEN AUTOMOTIVE INC.

By: /s/ David Michery

David Michery, Chief Executive Officer

24

Exhibit 99.1(a)

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Carve-out financial statements: | |
| Consolidated Balance Sheets as of September 30, 2020 and 2019 | F-3 |
| Consolidated Statements of Operations and Deficiency in Net Assets for the Years Ended September 30, 2020 and 2019 | F-4 |
| Consolidated Statements of Cash Flows for the Years Ended September 30, 2020 and 2019 | F-5 |
| Notes to Consolidated Financial Statements | F-6 |

The accompanying notes are an integral part of the consolidated financial statements.

F-1

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of
Mullen Technologies, Inc.
Brea, California

### Opinion on the Consolidated Financial Statements

We have audited the accompanying carve-out consolidated balance sheets of the Mullen-EV component of Mullen Technologies, Inc. (the "Company") at September 30, 2020 and 2019, and the related carve-out consolidated statements of operations and deficiency in net assets, and cash flows for each of the years in the two-year period ended September 30, 2020, and the related notes (collectively referred to as the carve-out consolidated financial statements). In our opinion, the carve-out consolidated financial statements present fairly, in all material respects, the financial position of the Company at September 30, 2020 and 2019, and the results of its operations and its cash flows for each of the years in the two-year period ended September 30, 2020, in conformity with accounting principles generally accepted in the United States of America.

### Going Concern Uncertainty

The accompanying carve-out consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As described in Note 2 to the carve-out consolidated financial statements, the Company has sustained net losses, its indebtedness in default, and has liabilities in excess of assets of approximately $42.5 million at September 30, 2020, which raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are described in Note 2. The carve-out consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to this matter.

### Carve-out Financial Statements

As discussed in Note 1, the Mullen-EV business is a component of Mullen Technologies, Inc. and is not a stand-alone entity. The carve-out consolidated financial statements of the Company reflect the assets, liabilities and expenses directly attributable to the Mullen-EV, as well as allocations deemed reasonable by management, to present the financial position, results of operations and deficiency in net assets, and cash flows of Mullen-EV on a stand-alone basis and do not necessarily reflect the financial position, results of operations, changes in deficiency in net assets and cash flows of Mullen-EV in the future or what they would have been had Mullen-EV been a separate, stand-alone entity during the periods presented.

### Change in Accounting Principle

As discussed in Note 3 to the carve-out consolidated financial statements, the Company has changed its method of accounting for leases upon adoption of Accounting Standards Update No. 2016-02, Leases (Topic 842), effective October 1, 2019.

### Basis for Opinion

These carve-out consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Daszkal Bolton LLP

We have served as the Company's auditor since 2020.

Fort Lauderdale, Florida
April 30, 2021

The accompanying notes are an integral part of the consolidated financial statements.

**MULLEN TECHNOLOGIES, INC.**
**(Carve-out of Certain Operations of Mullen Technologies, Inc.)**
**CONSOLIDATED BALANCE SHEETS**

| | September 30, 2020 | September 30, 2019 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $ 33,368 | $ 2,221,824 |
| Materials and supplies | 43,083 | 31,538 |
| Deferred advertising | 15,054,000 | 15,054,000 |
| Other current assets | 201,067 | 191,365 |
| **TOTAL CURRENT ASSETS** | 15,331,518 | 17,498,727 |
| Property, equipment and leasehold improvements, net | 1,541,996 | 1,973,563 |
| Intangible assets, net | 2,622,796 | 2,350,012 |
| Right-of-use assets | 1,729,112 | - |
| Other assets | 762,008 | 1,070,589 |
| **TOTAL ASSETS** | 21,987,430 | 22,892,891 |
| | | |
| **LIABILITIES AND DEFICIENCY IN NET ASSETS** | | |
| **CURRENT LIABILITIES** | | |
| Accounts Payable | 2,688,176 | 1,946,961 |
| Accrued expenses and other current liabilities | 22,151,589 | 20,052,858 |
| Lease liabilities, current portion | 336,765 | - |
| Notes payable, current portion | 33,048,471 | 20,007,874 |
| **TOTAL CURRENT LIABILITIES** | 58,225,001 | 42,007,693 |
| Notes payable, net of current portion | 283,881 | 10,260,906 |
| Lease liabilities, net of current portion | 1,482,569 | - |
| Other liabilities | 4,500,000 | 4,500,000 |
| **TOTAL LIABILITIES** | 64,491,451 | 56,768,599 |
| Commitments and Contingencies (Note 15) | | |
| | | |
| **DEFICIENCY IN NET ASSETS** | (42,504,021) | (33,875,708) |
| **TOTAL LIABILITIES AND DEFICENCY IN NET ASSETS** | $ 21,987,430 | $ 22,892,891 |

The accompanying notes are an integral part of the consolidated financial statements.

F-3

**MULLEN TECHNOLOGIES, INC.**
**(Carve-out of Certain Operations of Mullen Technologies, Inc.)**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**AND DEFICIENCY IN NET ASSETS**

|  | For the Year Ended September 30, | |
| --- | --- | --- |
|  | 2020 | 2019 |
| **OPERATING EXPENSES** | | |
| General and administrative | $ (10,427,141) $ | (11,326,099) |
| Research and development | (1,667,077) | (873,561) |
| **Total Operating Expenses** | (12,094,218) | (12,199,660) |
| **Loss from Operations** | (12,094,218) | (12,199,660) |
| | | |
| Interest expense | (18,094,234) | (29,170,183) |
| Gain on extinguishment of indebtedness, net | - | 603,549 |
| Loss on disposal of fixed assets | - | (73,061) |
| Other income (expense), net | 10,490 | (454) |
| **Net Loss** | $ (30,177,962) $ | (40,839,809) |
| | | |
| Deficiency in net assets, beginning of year | (33,875,708) | (9,615,016) |
| | | |
| MTI net increase to net assets | 8,628,313 | 24,260,692 |
| | | |
| Deficiency in net assets, end of year | $ (42,504,021) $ | (33,875,708) |

The accompanying notes are an integral part of the consolidated financial statements.

**MULLEN TECHNOLOGIES, INC.**
**(Carve-out of Certain Operations of Mullen Technologies, Inc.)**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the Year Ended September 30, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **Cash Flows Used in Operating Activities** | | |
| Net Loss | $ (30,177,962) $ | (40,839,809) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 725,796 | 866,771 |
| Impairment charge | 93,244 | 721,360 |
| Loss on disposal of fixed assets | - | 73,061 |
| Employee stock compensation | 1,037,102 | 875,765 |
| Issuance of MTI shares for services | 2,929,179 | 3,025,733 |
| Non-cash interest and other operating expenses | 2,019,642 | 792,695 |
| Non-cash lease expense | 270,854 | - |
| Amortization of debt discount | 16,008,454 | 28,377,488 |
| Gain on extinguishment of debt | - | (603,549) |
| | | |
| Changes in operating assets and liabilities: | | |
| Material and supplies | (11,545) | (69,322) |
| Other current assets | (9,701) | (115,064) |
| Other assets | 215,336 | (189,941) |
| Accounts payable | 741,215 | 995,475 |
| Accrued expenses and other liabilities | 2,031,050 | 2,541,146 |
| Lease liabilities | (244,257) | - |
| Net cash used in operating activities | (4,371,593) | (3,548,191) |
| | | |
| **Cash Flows from Investing Activities** | | |
| Purchase of equipment | (270,501) | 7,227 |
| Purchase of intangible assets | (296,511) | (720,920) |
| Net cash used in investing activities | (567,012) | (713,693) |
| | | |
| **Cash Flows from Financing Activities** | | |
| Changes in net parent investment | (4,781,497) | (7,550,985) |
| Issuance of notes payable | 12,118,309 | 18,371,569 |
| Payment of notes payable | (4,586,663) | (5,103,912) |
| Net cash provided by financing activities | 2,750,149 | 5,716,672 |
| | | |
| Increase (decrease) in cash | (2,188,456) | 1,454,788 |
| Cash, beginning of year | 2,221,824 | 767,036 |
| Cash, ending of year | $ 33,368 $ | 2,221,824 |
| | | |
| **Supplemental disclosure of Cash Flow information:** | | |
| Cash paid for interest | $ 800,423 $ | 268,413 |
| | | |
| **Supplemental disclosure for non-cash financing activities:** | | |
| Refinance of existing debt | $ 43,923,042 $ | 18,961,207 |
| Initial recognition of right-of-use assets and lease liabilities | $ 1,383,447 $ | - |
| Right-of-use assets obtained in exchange for lease liabilities | $ 680,144 $ | - |
| Deferred advertising | $ - $ | 15,054,000 |
| Indebtedness settled via issuance of MTI stock | $ 38,912,640 $ | 51,936,093 |

The accompanying notes are an integral part of the consolidated financial statements.

**MULLEN TECHNOLOGIES, INC.**
**(Carve-out of Certain Operations of Mullen Technologies, Inc.)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 1 – BASIS OF PRESENTATION AND DESCRIPTION OF BUSINESS

**Basis of Presentation**

These carve-out financial statements reflect the financial position, statement of operations, deficiency in net assets and cash flows related to the assets and liabilities of (the "Mullen EV Net Assets") ("Mullen-EV") which management plans to transfer to Mullen Acquisition Corporation ("Mullen AC" or "the Company") by its parent company Mullen Technologies, Inc. ("MTI") in 2021.

As MTI has not historically prepared financial statements for the Mullen EV Net Assets, and Mullen AC did not exist as a legal entity prior to 2021, the carve-out financial statements have been prepared from the financial records of MTI on a carve-out basis. The Carve-out consolidated Statements of Financial Position include all of the Mullen EV Net Assets. The Carve-out consolidated Statements of Operations for each of the years ended September 30, 2020 and 2019 reflect all expenses and activity directly attributable to the Mullen EV Net Assets, and an allocation of MTI's general and administrative expenses incurred in each of those years, as these expenditures were shared by the Mullen EV Net Assets. In some instances, certain expenses were not allocated as they would have related directly to Mullen-EV. All inter-entity balances and transactions have been eliminated.

The carve-out financial statements of Mullen-EV have been prepared in accordance with Generally Accepted Accounting Principles in the United States ("US GAAP").

These carve-out financial statements have been prepared based upon the historical cost amounts recorded by MTI. These carve-out financial statements may not be indicative of Mullen-EV financial performance and do not necessarily reflect what its financial position, results of operations, and cash flows would have been had Mullen-EV operated as an independent entity during the years presented.

**Organization**

The carve-out financial statements consist of the electric vehicle division of MTI, including the MTI asset acquisition of CarHub, Inc., which the Company plans to offer an interactive data management solution for the automotive industry (collectively, Mullen-EV or "the Company"). MTI has two electric vehicles under development which it expects to commercialize and begin delivery of in the second quarter of 2024.

## NOTE 2 – LIQUIDITY, CAPITAL RESOURCES, AND GOING CONCERN

The accompanying carve-out financial statements have been prepared on the basis that the Company will continue as a going concern. The Company's principal sources of liquidity at September 30, 2020 consists of existing cash of approximately $33,000. During the year ended September 30, 2020, the Company consumed $4.37 million of cash for operating activities. Subsequent to September 30, 2020, the Company obtained additional financing in the amount of approximately $4.49 million in unsecured convertible notes.

The Coronavirus ("COVID-19") continues to impact countries, communities, supply chains and markets, global financial markets, and various industries. To date, COVID-19 has had a material impact on the Company's strategy in EV product development and the ability to obtain external financing to fund its development activities. The Company cannot predict whether the global pandemic will continue to have a material impact on our future financial condition and results of operations.

The Company has not generated any revenues since inception, and operations have been funded with proceeds from the MTI's sale and issuance of equity securities and indebtedness. The Company has sustained losses of $30.2 million during the year ended September 30, 2020. The losses are primarily the result of research and development costs associated with the planned commercialization of the Company's technology, combined with start-up, financing, and general and administrative costs.

### Going Concern

As an early-stage development company, Mullen-EV's ability to access capital is critical. Management plans to raise additional capital through a combination of debt financings, strategic alliances and licensing arrangements.

Due to the conditions described above, management believes that there is substantial doubt about the Company's ability to continue as a going concern in the foreseeable future. The Company plans to raise additional capital from the sale of equity securities or the incurrence of indebtedness by MTI to allow the Company to continue operations. There can be no assurance that additional financing will be available on acceptable terms, or at all. If MTI cannot raise needed funds, the Company might be forced to curtail or make substantial reductions in its development activities, which would adversely affect the Company's ability to implement its business plan.

To date, the Company's existing cash resources and existing borrowing capability is not sufficient to support planned development operations for the next 12 months. As a result, management may need to consider restructuring changes to streamline operations and manage expenses, in addition to debt refinancing and capital plan. Management is seeking merger opportunities to become a public company to gain access to the capital markets for liquidity, funding, and capital needs. See note 17, subsequent events.

*The accompanying notes are an integral part of the consolidated financial statements.*

## NOTE 3 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Significant accounting policies are defined as those that are reflective of significant judgments and uncertainties, and potentially result in materially different results under different assumptions and conditions.

### Push-Down Accounting

The carve-out financial statements reflect costs and expenses incurred by MTI on behalf of Mullen-EV, including interest costs. As a result, share-based compensation and other equity transactions (such as issuances of warrants and stock conversion rights embedded in issuances of indebtedness) are reflected in these carve-out financial statements. Accordingly, the classification of debt and equity issuances by MTI have been pushed down and reflected with similar classification in these carve-out financial statements. In addition, certain right-of-use assets and related lease liabilities of MTI have been pushed down to Mullen-EV.

### Use of Estimates

The preparation of carve-out financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the dates of the carve-out financial statements and the reported amounts of total expenses in the reporting periods. Estimates are used for, but not limited to, fair value of long-lived assets, fair value of financial instruments, depreciable lives of property and equipment, income taxes, contingencies, and inputs used to value stock-based compensation, valuation of common and preferred stock issued by MTI.

Additionally, the rates of interest on several debt agreements have been imputed where there was no stated interest rate within the original agreement. The imputed interest results in adjustments to the debt amounts reported in our carve-out financial statements prepared under U.S. GAAP. Loan valuations issues can arise when trying to determine the debt attributes, such as discount rate, credit loss factors, liquidity discounts, and pricing.

Management bases its estimates on historical experience and on various other assumptions believed to be reasonable, the results of which form the basis for adjustments about the carrying values of assets and liabilities and the recording of costs and expenses that are not readily apparent from other sources. The actual results the Company experiences may differ materially from these estimates.

### Risks and Uncertainties

The Company operates within an industry that is subject to rapid technological change, intense competition, and serves an industry that has significant government regulations. It is subject to significant risks and uncertainties, including competitive, financial, developmental, operational, technological, required knowledge of industry governmental regulations, and other risks associated with an emerging business. Any one or combination of these or other risks could have a substantial influence on the future operations and prospects for commercial success of the Company.

### Deferred Advertising

Deferred advertising represents a marketing campaign, financed by a third party, that is carried as an asset on the consolidated balance sheets until used or consumed. At September 30, 2020 and 2019, these deferred advertising charges of $15.1 million are associated with the AirSign advertising contract and the RedRock Outdoor Advertising Display advertising contract.

### Prepaid Expenses and Other Current Assets

Prepaid expenses consist of various advance payments made by the Company for goods or services to be received in the future. These prepaid expenses include insurance, and other contracted services requiring up-front payments.

### Property, Equipment and Leasehold Improvements, Net

Property, equipment and leasehold improvements are stated at cost less accumulated depreciation. Depreciation is calculated using the straight-line method over the estimated economic useful lives of the assets. Repairs and maintenance expenditures that do not extend the useful lives of related assets are expensed as incurred.

#### Estimated Useful Lives

| Description | Life |
| --- | --- |
| Buildings | 30 years |
| Furniture and Equipment | 5 years |
| Computer and Software | 1 - 3 years |
| Machinery and Equipment | 5 years |
| Leasehold Improvements | Shorter of the estimated useful life or the underlying lease term |
| Vehicles | 5 years |

Expenditures for major improvements are capitalized, while minor replacements, maintenance and repairs, which do not extend the asset lives, are charged to operations as incurred. Upon sale or disposition, the cost and related accumulated depreciation are removed from the accounts and any gain or loss is included in operations. The Company continually monitors events and changes in circumstances that could indicate that the carrying balances of its property, equipment and leasehold improvements may not be recoverable in accordance with the provisions of ASC 360, *"Property, Plant, and Equipment."* When such events or changes in circumstances are present, the Company assesses the recoverability of long-lived assets by determining whether the carrying value of such assets will be recovered through undiscounted expected future cash flows. If the total of the future cash flows is less than the carrying amount of those assets, the Company recognizes an impairment loss based on the excess of the carrying amount over the fair value of the assets.

The accompanying notes are an integral part of the consolidated financial statements.

**Intangible Assets**

Intangible assets consist of acquired and developed intellectual property, and website development costs. In accordance with ASC 350, *"Intangibles—Goodwill and Other,"* goodwill and other intangible assets with indefinite lives are no longer subject to amortization but are tested for impairment annually or whenever events or changes in circumstances indicate that the asset might be impaired. Intangible assets with determinate lives are evaluated for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Amortizable intangible assets are generally amortized on a straight-line basis over periods up to 36 months. The costs to periodically renew our intangible assets are expensed as incurred.

**Other Assets**

Other assets are comprised primarily of Coda electric vehicles, related parts and security deposits related to the Company's property leases related to the EV business only.

**Extinguishment of Liabilities**

The Company derecognizes financial liabilities when the Company's obligations are discharged, cancelled, or expired.

**Leases**

In February 2016, the FASB issued Accounting Standards Update (ASU) No. 2016-02, "Leases" (ASU 2016-02). The core principle of ASU 2016-02 is that lessees should recognize on its balance sheet assets and liabilities arising from a lease. In accordance with that principle, ASU 2016-02 requires that a lessee recognize a liability to make lease payments (the lease liability) and a right-of-use asset representing its right to use the underlying leased asset for the lease term. Lessees shall classify all leases as finance or operating leases. The Company adopted ASU 2016-02, on October 1, 2019, which resulted in the recognition of the right-of-use assets and related obligations on its carve-out financial statements.

**Accrued Expenses**

Accrued expenses are expenses that have been incurred by the Company but not yet paid. They are properly accounted for within current liabilities on the consolidated balance sheets.

**General and Administrative Expenses**

General and administrative ("G&A") expenses include all non-production expenses incurred by the Company in any given period. This includes expenses such as professional fees, salaries, rent, repairs and maintenance, utilities and office expense, employee benefits, depreciation and amortization, advertising and marketing, settlements and penalties, taxes, licenses and other. Advertising costs are expensed as incurred and are included in G&A expenses. The Company expenses advertising costs as incurred in accordance with ASC 720-35, *"Other Expenses – Advertising Cost."*

**Research and Development Costs**

Research and development costs are expensed as incurred, and includes a loss on impairment of $93,244 and $721,360 for the years ended September 30, 2020 and 2019, respectively.

**MTI Share-Based Compensation**

The Company accounts for is share-based awards issued by MTI in accordance with ASC Subtopic 718-10, *"Compensation – Share Compensation"*, which requires fair value measurement on the grant date and recognition of compensation expense for all common share of MTI issued to employees, non-employees and directors. The fair value of our non-marketable share has been estimated based on an independent valuation. The MTI common and preferred share valuations have been appraised by an independent financial valuation advisor, based on assumptions management believes to be reasonable. Key assumptions and approaches to value used in estimating fair value, includes economic and industry data; business valuation; prior transactions; option value method and other cost, income and market value approaches. Share-based compensation is accounted for within G&A expenses.

**Related Party Transactions**

The Company has related party transactions with its directors, officers and principal shareholders. These transactions, which are primarily long-term in nature, include operational loans, convertible debt, and warrants for financial support associated with the borrowing of funds and are entered into in the ordinary course of business.

**Fair Value of Financial Instruments**

The Company applies fair value accounting for all financial assets and liabilities and non-financial assets and liabilities that are recognized or disclosed at fair value on a recurring basis. The Company defines fair value as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities that are required to be recorded at fair value, the Company considers the principal or most advantageous market in which the Company would transact and the market-based risk measurements or assumptions that market participants would use in pricing the asset or liability, such as risks inherent in valuation techniques, transfer restrictions and credit risk. Fair value is estimated by applying the following hierarchy, which prioritizes the inputs used to measure fair value into three levels and bases the categorization within the hierarchy upon the lowest level of input that is available and significant to the fair value measurement:

*Level 1 – Quoted prices in active markets for identical assets or liabilities.*

The accompanying notes are an integral part of the consolidated financial statements.

*Level 2 – Observable inputs other than quoted prices in active markets for identical assets and liabilities, quoted prices for identical or similar assets or liabilities in inactive markets, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.*

*Level 3 – Inputs that are generally unobservable and typically reflect management's estimate of assumptions that market participants would use in pricing the asset or liability.*

**Concentrations of Business and Credit Risk**

The Company maintains cash balances in several financial institutions that are insured by either the Federal Deposit Insurance Corporation or the National Credit Union Association up to certain federal limitations. At times, the Company's cash balance exceeds these federal limitations and maintains significant cash on hand at certain of its locations. However, the Company has not experienced any losses in such accounts and management believes the Company is not exposed to any significant credit risk on these accounts. The amount in excess of insured limitations was $0 and $1,971,824 on September 30, 2020 and 2019, respectively.

**Recently Issued and Adopted Accounting Standards**

In February 2016, the FASB issued Accounting Standards Update (ASU) No. 2016-02, "Leases" (ASU 2016-02). The core principle of ASU 2016-02 is that lessees should recognize on its balance sheet assets and liabilities arising from a lease. In accordance with that principle, ASU 2016-02 requires that a lessee recognize a liability to make lease payments (the lease liability) and a right-of-use asset representing its right to use the underlying leased asset for the lease term. The standard requires lessees to classify leases as either finance or operating leases. This classification determines whether the related expense is recognized based on asset amortization and interest on the obligation (finance leases) or on a straight-line basis over the term of the lease (operating lease). We recorded a ROU asset and a lease liability for all leases with a term of greater than 12 months regardless of their classification. We have elected the practical expedient to not apply these recognition requirements to leases with a term of 12 months or less. Instead, we recognize the lease payments on a straight-line basis over the lease term.

This new accounting guidance was effective for public companies for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. The Company adopted ASU 2016-02, on October 1, 2019 which resulted in the initial recognition of $1,383,447 in right-of-use assets and lease liabilities on its consolidated carve-out financial statements. The adoption of the ASUs did not have a material impact on the consolidated statement of operations or the consolidated statement of cash flows.

In January 2017, the FASB issued Accounting Standards Update No. 2017-01 (ASU 2017-01) "Business Combinations (Topic 805): Clarifying the Definition of a Business." ASU 2017-01 provides guidance to evaluate whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. If substantially all of the fair value of the gross assets acquired (or disposed of) is concentrated in a single asset or a group of similar assets, the assets acquired (or disposed of) are not considered a business. The Company adopted ASU 2017-01 on a prospective basis to transactions after October 1, 2018. The acquisition of the controlling interest in CarHub was accounted for as a group of assets which were not considered a business.

In January 2017, the FASB issued Accounting Standards Update No. 2017-04 (ASU 2017-04) (Topic 350), "Intangibles - Goodwill and Others. ASU 2017-04 simplifies how an entity is required to test goodwill for impairment by eliminating Step 2 from the goodwill impairment test. Step 2 measures a goodwill impairment loss by comparing the implied fair value of a reporting unit's goodwill with the carrying amount of that goodwill. ASU 2017-04 is effective for annual periods beginning after December 15, 2019 (October 1, 2020 for the Company) including interim periods within those periods. The Company does not expect the standard to have a material impact on its carve-out financial statements and related disclosures.

In June 2018, the FASB issued Accounting Standards Update No. 2018-07 (ASU 2018-07) ASU No. 2018-07 (Topic 718), "Compensation—Stock Compensation: Improvements to Nonemployee Share- Based Payment Accounting". ASU 2018-07 expands the scope of Topic 718 to include share-based payment transactions for acquiring goods and services from nonemployees. The amendments also clarify that Topic 718 does not apply to share-based payments used to effectively provide (1) financing to the issuer or (2) awards granted in conjunction with selling goods or services to customers as part of a contract accounted for under Topic 606. The new standard will be effective for the Company on October 1, 2020. Adoption of this guidance is not expected to have a material impact on the Company's financial condition or results of operations.

**NOTE 4 – ASSET ACQUISITION**

The Company continually evaluates potential acquisitions that strategically fit within the Company's business strategy. On October 26, 2018, the Company entered into an Asset Agreement with CarHub, Inc. ("CarHub") pursuant to which the Company purchased 95% of the then issued and outstanding shares of stock of CarHub in exchange for 1,150,000 shares of MTI common stock.

The accompanying notes are an integral part of the consolidated financial statements.