

**mwe.com**

David K. Momborquette
Attorney at Law
dmomborquette@mwe.com
+1 212 547 5490

May 23, 2024

**VIA ECF**

Honorable Katherine Polk Failla
United States District Court
Southern District of New York
Thurgood Marshall
United States Courthouse
40 Foley Square, Room 2103
New York, NY 10007

Re:   *GEM Yield Bahamas Limited, et al. v. Mullen Technologies, Inc. et al.*, No. 1:24-cv-01120-KPF
Letter in Response to Petitioners' Request for a Pre-Motion Conference

To the Honorable Katherine Polk Failla:

  We represent Respondents Mullen Technologies, Inc. ("MTI") and Mullen Automotive, Inc. ("MAI," and together with MTI, "Respondents") in the above-referenced action. We write in response to Petitioners' May 20, 2024 letter to the Court requesting an expedited pre-motion conference seeking permission to file a motion for sanctions and contempt against Respondents (ECF No. 80, the "Letter Request").[1] For the reasons delineated below, the Letter Request should be denied given that such a motion for contempt would be wholly unwarranted in these circumstances.

  As an initial matter, Petitioners are seeking to move for contempt against both MTI and MAI. However, the Letter Request contains no allegations of fact concerning MTI, and instead, treats MAI and MTI as one, undifferentiated entity. As Respondents have made clear before, MTI and MAI are separate corporations, and there is no basis to treat them as one. Accordingly, Petitioners' request should be denied with respect to MTI on this ground alone.

  With respect to MAI, Petitioners would have this Court believe that MAI is defying the Court's authority by willfully conveying away cash for some illegal or inequitable purpose or otherwise intentionally placing cash available to it beyond Petitioners' reach to frustrate Petitioners' ability to satisfy any judgment that they may ultimately obtain against MAI. That is not an accurate description of MAI's actions. MAI is a public company employing hundreds of employees. It has assets valued at more than $214 million. (*See* ECF No. 80-1 at 3.) In recent months, MAI has suffered a severe cash shortage that

---

[1] Capitalized terms that are not defined herein have the meanings set forth in the Letter Request.



One Vanderbilt Avenue   New York NY 10017-3852   Tel +1 212 547 5400   Fax +1 212 547 5444

*US practice conducted through McDermott Will & Emery LLP.*

Honorable Katherine Polk Failla
May 23, 2024
Page 2

has left it teetering on the brink of insolvency. As the 10-Q starkly notes: "[i]f the Company does not secure adequate funding to fulfill its current liabilities, it anticipates seeking bankruptcy protection in various jurisdictions within 30 days of publishing these financial statements." (*Id.* at 10.) To avoid this fate, MAI has taken certain affirmative actions to maximize its cash reserves. For instance, it has publicly announced that it "plans to further reduce its workforce and streamline operations, including downsizing its physical locations." (*Id.*) Moreover, MAI has been actively seeking financing that would alleviate this cash crunch by bringing additional cash into the company. (*Id.*) It is only very recently that MAI has secured a commitment for such financing that could bring upwards of $150 million dollars, over time, into MAI, thereby providing it with the financial wherewithal to continue operating as a going concern. (*Id.* at 10, 43-44.) MAI is in active negotiations to secure more financing.

There is no question that, at some point in time, MAI's cash reserves fell below the $24 million threshold. However, this cash shortage was not the result of a willful act of MAI's to dissipate assets. Petitioners' assertion that MAI dissipated previously sufficient cash it had on hand by purposefully utilizing that cash to settle other lawsuits is simply inaccurate. (*See* Letter Request at 2-3.) Of the approximately $6.7 million paid by MAI in the first quarter of 2024 for settlements and penalties (*see* ECF No. 80-1 at 35), $1.95 million was in connection with a settlement reached in December 2023 (*id.* at 38); that is, at a time prior to the issuance of the second interim measures award by the arbitrator. Another $4.6 million dollars was paid by MAI to settle one other matter, but that settlement was paid for using securities, not cash. (*Id.* at 42.)

Moreover, the reality is that, if MAI did not have use of its funds to operate its business, two things almost certainly would have occurred. First, MAI would have had to seek bankruptcy protection, leaving Petitioners, at best, as general, unsecured creditors of MAI since they have no security interest in those funds. Second, MAI certainly would not have obtained the additional financing commitments that it ultimately has secured, financing that will bring the needed cash into the business. In short, if MAI had acted in the manner that Petitioners argue it should have, Petitioners undoubtedly would have been in a far worse position than they find themselves in today.

Petitioners' attempt to use the 10-Q to demonstrate that MAI has no intention of ever complying with the Court's orders is unavailing. (*See* Letter Request at 3.) For instance, there is no basis to conclude that MAI has no intent to comply with the Court's orders because the Final Award is not referenced anywhere in the 10-Q or an additional $24,114,921 is not included in the 10-Q's line item for "Restricted Cash." The Final Award was issued on May 10, 2024, a second quarter 2024 event, while the 10-Q is MAI's quarterly filing for the first quarter of 2024. In any event, the 10-Q affirmatively discloses that the arbitrator ordered MAI to deposit an additional $24,114,921 into escrow and expressly acknowledges Petitioners' efforts to confirm that order. (ECF No. 80-1 at 38.) If MAI had embarked on some scheme to actively conceal its obligations to this Court, as Petitioners contend, it would not have made that disclosure in the first instance.



Honorable Katherine Polk Failla
May 23, 2024
Page 3

      There also is no basis to seek any coercive relief or sanctions against any officer or director of MAI, as Petitioners urge, since neither of the Court's orders at issue here are directed at any of them. *Cf. Absolute Nevada, LLC v. Baer*, 2022 WL 350255, at *2 (2d Cir. Feb. 7, 2022) (officer clearly identified in and bound by stipulation and order at issue).

      The timing of the Letter Request's submission strongly suggests that the request was filed primarily for strategic reasons. MAI's cash flow issues are not news to Petitioners. They have been aware of MAI's financial status for months, and principals from both sides and their counsel have spoken directly with one another regarding that topic. However, it was not until immediately after the parties had agreed this week to a briefing schedule on their respective motions to confirm or vacate the Final Award, with MAI taking the initial lead on briefing (*see* ECF No. 78), that Petitioners sought (and on an expedited basis no less) a pre-motion conference with the Court. Although Petitioners were required under Rule 4(A) of the Court's Individual Rules of Practice in Civil Cases to indicate in the Letter Request whether their motion request was on consent, they failed to do so, and failed to do so for the simple reason that Petitioners' counsel never bothered to discuss the request with MAI's counsel. In short, Petitioners felt no need to seek Court intervention until they concluded it was strategically advantageous to do so.

      Petitioners do not a have a judgment against MAI. Rather, the measures at issue here are interim measures that were meant to provide Petitioners with security prior to the issuance of a final award. However, interim measures that render a party insolvent before a judgment is obtained typically are not imposed. *See Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 609 (S.D.N.Y. 2014) (reasoning that the non-moving party's "serious risk of insolvency" resulting from the injunction outweighed the movant's risk of losing the nominal value of their notes); *Cooper v. TWA Airlines, LLC*, 274 F. Supp. 2d 231, 250-51 (E.D.N.Y. 2003) (concluding that the balance of the hardship did not tip in plaintiffs' favor where the "highly probable result" of the injunction would be to force the non-movant to declare bankruptcy).

      Similarly, with respect to allegations of contempt, one Court has emphasized that "[c]ontemnors are not required to liquidate every single item of value that they own, nor are they required to bankrupt themselves in order to show that . . . they have made all reasonable efforts to comply with [a] Court Order." *Liberty Mut. Ins. Co. v. Aventura Eng'g & Constr. Corp.*, 2009 WL 10697338, at *1 (S.D. Fla. Sept. 30, 2009). Nevertheless, that result is precisely what Petitioners are advocating should happen here. However, the law does not force a litigant to choose between a contempt finding and bankruptcy.

Respectfully submitted,

*/s/ David K. Momborquette*
David K. Momborquette

